IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ABRAHAM YAACOV, | ) | CASE NO. 1:08 CV 147 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| v. | ) | |
| | ) | |
| TERRY J. COLLINS, *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **& ORDER** |
| Defendants. | ) | |

## Introduction

In this case before me on consent,[1] Abraham Yaacov, a Jew whose sincerity of belief is not at issue, filed a complaint under 42 U.S.C. § 1983 alleging a violation of his First Amendment rights to free exercise.  Administrators at the Mansfield prison denied him a Kosher meal plan for three years because their policy, which has since been revised, mandated that only prisoners registered as Orthodox Jews would receive a Kosher meal plan.  Yaacov did not register as an Orthodox Jew.  Yaacov seeks a declaration that this policy was unconstitutional, and he asks for compensatory and punitive damages.

Defendants, administrators of the Ohio Department of Rehabilitation and Corrections, respond that, under the Supreme Court's decision in *Turner v. Safley*,[2] the former policy reasonably related to the legitimate penological interest of cost control for budgetary reasons,

---

[1] ECF # 31.

[2] *Turner v. Safley*, 482 U.S. 78 (1987).

and, therefore, was constitutional.  Defendants move for summary judgment,[3] and Yaacov

cross-moves for summary judgment.[4]

The pending motions present one overarching issue for decision:

Under the First Amendment, prison policies may restrict prisoners' rights to free exercise if those policies are reasonably related to legitimate penological interests.  Administrators at the Mansfield Correctional Institution denied Yaacov Kosher meals because the prison's former policy, created to respect budget constraints, restricted such meals to only Orthodox Jewish prisoners. Did this policy violate Yaacov's right to free exercise?

I conclude that the defendant's decision to restrict Kosher meals to prisoners

registered as Orthodox Jews had a reasonable relationship to the legitimate penological

interest of cost control for budgetary reasons.  I, therefore, grant the defendants' motion for

summary judgment and deny Yaacov's cross-motion.

## Statement of the Facts and of the Case

**A.     Underlying facts**

Yaacov converted to Judaism several years before his incarceration.[5]  Thereafter he

practiced certain religious principles, including observing the Jewish Kosher dietary laws.[6]

Following his conviction, he registered as a member of the Jewish faith at Lorain

------

[3] ECF # 27.

[4] ECF # 36.

[5] ECF # 1, Ex. A, ECF # 27 at 3.

[6] ECF # 1 at 4.

Correctional Institution.[7]  He was then transferred to the Mansfield Correctional Institution where he was denied accommodations allotted to Jewish inmates because he failed to register as Jewish at the reception center; this denial continued until he presented outside verification of his faith.[8]  Yaacov received verification and forwarded it to the prison chaplain and requested permission to practice Judaism.[9]  After approximately one month, Yaacov received permission to attend Jewish religious services, but he was not provided Kosher meals.[10]  According to Yaacov, the chaplains informed him that he would not receive Kosher meals without court intervention.[11]

Yaacov next proceeded administratively to receive Kosher meals.  In July of 2006, he completed a "Request for Religious Accommodations" form that requested Kosher meals and forwarded it to the chaplains.[12]  According to procedure, after the chaplain makes a recommendation regarding the request form, it is forwarded to the Deputy Warden of Special Services and the Deputy Warden of Operations for review, and then it is forwarded to the Warden for a final approval.[13]  It is then returned to the Religious Service Administrator, then

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*, Exs. A, B.

[11] *Id.* at 4.

[12] ECF # 1, Ex. D, ECF # 27 at 3.

[13] ECF # 1 at 5.

the chaplain's office, and finally to the inmate for a possible appeal.[14]  A week later, the chaplain did not recommend Yaacov's request because Yaacov had not registered as an Orthodox Jew.[15]

The chaplain's recommendation was made in accordance with ODRC Policy 72-REG-07 § V(E), which states:  "The Department will provide appropriate Kosher-equivalent meals only to recognized Jewish inmates whose association with the Orthodox tradition makes such meals a mandatory requirement for them."[16]  Yaacov claims that he did not receive this information prior to registration.[17]

Yaacov filed an Informal Complaint Resolution to the Deputy Warden of Special Services, who recommended that Yaacov wait for a response from Gary Sims, the Religious Services Administrator.[18]  Having received no response, Yaacov filed a Notification of Grievance to the Inspector of Institutional Services.[19]  After approximately one month, the Inspector of Institutional Services concluded that there had been procedural errors in the processing of Yaacov's request for Kosher meals, and he submitted a report to the Warden

---

[14] *Id.*

[15] ECF # 1, Ex. E, ECF # 27 at 4.

[16] ECF # 27, Ex. 3.

[17] ECF # 1 at 5.

[18] *Id.*, Ex. F.

[19] *Id.*, Ex. G.

with a request to take appropriate action.[20]  The Warden responded to Yaacov that he agreed with the recommendations of the chaplains, the Deputy Warden of Special Services, and the Deputy Warden of Operations that Yaacov ought not to receive Kosher meals.[21]

Next, Yaacov filed an Appeal of Denial of Religious Accommodations to the Religious Services Administrator, claiming that his constitutional rights had been violated by the denial of his request for Kosher meals.[22]  The appeal was denied.[23]  Yaacov filed the federal complaint two years after the submission of his initial request,[24] and afterward he began receiving Kosher meals.[25]  He refused the meals for seven days out of protest.[26]

## B.    Complaint

Yaacov filed a complaint *pro se* pursuant to 42 U.S.C. § 1983 against the defendants Terry Collins, Director of the ODRC; Gary Sims, Sr., the Religious Services Administrator of the ODRC; Stuart Hudson, the Warden at the Mansfield Correctional Institution; John Henderschot, the Deputy Warden of Special Services at the Mansfield Correction Institution;

---

[20] *Id.*, Ex. H.

[21] *Id.*, Ex. E.

[22] ECF # 1, Ex. I, ECF # 27 at 4.

[23] ECF # 1, Ex. J, ECF # 27 at 4.

[24] ECF # 1, ECF # 27 at 4.

[25] ECF # 26 at 95, ECF # 27, Ex. 2.

[26] ECF # 26 at 104-05, ECF # 27 at 4.

and Jon Maas and Ron Smith, chaplains at the Mansfield Correctional Institution.[27] The complaint lists Collins, Hudson, and Henderschot as defendants in their official capacity and Sims, Maas, and Smith in their official and individual capacities, claiming that each of the defendants acted under the color of state law.[28]

Yaacov claims that: (1) the defendants violated Yaacov's rights of free exercise under the First Amendment by not providing Kosher meals; (2) ODRC Policy 72-REG-07 § V(E) is unconstitutional for limiting Kosher meals to Orthodox Jewish prisoners; (3) Yaacov is sincere about his Jewish beliefs and has been forced to consume cereal without milk, peanut butter, and fresh fruits and vegetables in place of Kosher meals; and (4) Yaacov has suffered irreparable injury and has no plain, complete, or adequate remedy at law.[29] He asks for a declaration that the defendants violated his First Amendment rights, a declaration that the prison policy was unconstitutional, a preliminary and permanent injunction granting Yaacov Kosher meals, punitive damages, a jury trial, and costs.[30]

**C.    Answer**

The defendants respond that: (1) the complaint fails to assert a claim upon which relief can be granted; (2) the allegations do not give rise to jurisdiction under 42 U.S.C § 1983; (3) allegations of violation of constitutional rights are denied; (4) the defendants

---

[27] ECF # 1 (Complaint) at 1-3.

[28] *Id.*

[29] *Id.* at 6-7.

[30] *Id.* at 8-9.

acted in good faith at all relevant times; (5) qualified immunity protects the defendants against suit; (6) the Eleventh Amendment bars claims for damages; (7) Yaacov failed to exhaust his remedies in the prison system; (8) the allegations are conclusory and fail to allege facts sufficient to sustain an action; (9) the statute of limitations and/or doctrine of laches bars Yaacov's claim; (10) allegations alluding to statements made by or to the defendants are denied, and allegations referring to unnamed defendants are denied; (11) all allegations not admitted to in the answer are denied; (12) the defendants reserve right to any affirmative defenses not yet raised; and (13) any personal involvement in allegations of violation of constitutional rights is denied.[31]  The defendants further request a jury trial.[32]

## D. Motion for summary judgment

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56 and attach unsworn statements made pursuant to 28 U.S.C. § 1746 by Ronald Smith, chaplain at the Mansfield prison, and Austin Stout, Assistant Chief Counsel of the ODRC.  They also attach a Mansfield prison memo that states that Yaacov will now receive Kosher meals, along with a copy of the pertinent policy challenged by Yaacov.

The summary judgment motion claims that:  (1) Yaacov's complaint is moot; (2) the challenged policy is reasonably related to legitimate penological interests under the First Amendment analysis offered by *Turner v. Safley*;[33] (3) Yaacov can recover no monetary

---

[31] ECF # 14 at 1-3.

[32] *Id.* at 3.

[33] *Turner*, 482 U.S. 78.

damages under the Prison Litigation Reform Act; (4) Yaacov cannot recover punitive damages; and (5) qualified immunity protects defendants.[34]

Smith's declaration states that Yaacov now receives Kosher meals, and a new prison policy will replace the challenged policy and will remove the mandate that only Orthodox Jews receive Kosher meals.[35] He attaches the memo that Yaacov now receives Kosher meals.

Stout's declaration states that providing a Kosher meal to every inmate who requests one is not cost effective. Proper Kosher preparation would require the installation of a separate prison kitchen. Pre-packaged Kosher meals at the prison cost $7.00 per meal as opposed to $0.80 per main-line meal, and $5,110.00 per inmate per year. At breakfast, alternative foods like cereals that satisfy Kosher requirements are available for prisoners, and prisoners have the further alternative of purchasing Kosher meals from the institution's commissary.[36]

**E.    Cross-motion for summary judgment**

Yaacov files a cross-motion and attaches his own declaration that states that he has no supporting affidavits to attach.[37] His cross-motion claims that: (1) the defense that the complaint is moot does not show the absence of a genuine issue of material fact; (2) qualified immunity does not apply because the defendants acted knowingly violating Yaacov's First

---

[34] ECF # 27 at 7-16.

[35] *Id.*, Ex. 1 at 2.

[36] *Id.*, Ex. 3 at 2.

[37] ECF # 36, Ex. 1 at 4.

Amendment rights; (3) the defendants personally participated in the violation of Yaacov's rights; and (4) the defendants show no absence of a genuine issue of material fact.[38]

In support of his first argument, that the mootness defense does not preclude a genuine issue of material fact, Yaacov claims that the defendants acted deliberately indifferent, and therefore, they violated Yaacov's First Amendment rights.[39]  He argues that the defendants violated the second prong under *Turner* by not providing an alternative means to the free exercise of consuming Kosher meals.[40]  He concedes that adding Kosher kitchens to prisons is not cost effective.[41]  Yaacov does not maintain that he is an Orthodox Jew.

In support of his fourth argument, that the defendants failed to establish the absence of a genuine issue of material fact, Yaacov responds to Defendants' *Turner* defense.  He questions whether the challenged policy was indeed reasonably related to budget constraints, offering the fact that the prison is revising the challenged policy as evidence:

> Plaintiff moves the Court to answer the following questions: "What has changed between Plaintiff's request for Kosher meals, and the filing of the instant Complaint?" "Why are the Defendants now providing the meals?" "Why is the policy now being revised if, in its current form, it serves penological interests?" "Why not wait until the Court decide [sic] the issues?"[42]

---

[38] ECF # 36 at 7-15.

[39] *Id.* at 8.

[40] *Id.* at 9.

[41] *Id.* at 10.

[42] *Id.* at 15.

Yaacov requests that this Court deny the defendants' motion for summary judgment and instead grant his cross-motion along with compensatory and punitive damages.  In the alternative, Yaacov requests a trial by jury.[43]

**F.    Further pleadings**

The defendants respond to Yaacov's cross-motion for summary judgment with a brief that recounts the five arguments in support of their motion.  Additionally, they attach the revised prison policy that has excluded the Orthodox limitation to Kosher meals.[44]

Yaacov supplements his motion for summary judgment with a declaration by Willie Speed, Yaacov's former cell mate, who attests that Yaacov suffered injury during the time that the Mansfield prison denied him Kosher meals: "I witnessed Mr. Yaacov lose several pounds and was physically weak all of the times [sic]."[45]  Yaacov assures the Court that this supplement is not frivolous, but rather it is essential to support his argument that there exists a genuine issue of material fact in this case.[46]

## Analysis

Yaacov seeks compensatory and punitive damages.  His requests for injunctive and declaratory relief are moot because he now receives Kosher meals, and the ODRC has

---

[43] *Id.*

[44] ECF # 39, Ex. B at 4-6.

[45] ECF # 41, Ex. A at 2.

[46] ECF # 41 at 2.

vacated the challenged policy.[47]  But Yaacov's claim for damages to compensate the alleged deprivation of his First Amendment rights is still alive.[48]

The threshold issue here is whether the challenged prison policy is constitutional under *Turner v. Safley*.  If it is constitutional, then Yaacov has no remaining claim, and the defendants are entitled to summary judgment.

## A.    The summary judgment standard

The parties here make cross-motions for summary judgment pursuant to Civil Rule 56, which states:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.[49]

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case.[50]  Once the initial burden is met, the burden shifts to the non-moving party to set forth specific facts showing a triable issue.[51]

---

[47] *See*, *Cardinal v. Metrish*, 564 F.3d 794, 798 (6th Cir. 2009).

[48] *See*, *Brandywine, Inc. v. City of Richmond*, 359 F.3d 830, 836 (6th Cir. 2004).

[49] Fed. R. Civ. P. 56(c).

[50] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[51] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The materiality prong of "genuine issues of material fact" refers to the elements, as defined by substantive law, that are essential to the legal claim presented in a complaint.[52] The judge does not act as jury in weighing the credibility of evidence offered at the summary judgment stage but, rather, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[53]  For an issue to be genuine, a non-movant must present evidence in response to a motion for summary judgment that would allow a reasonable jury to rule in his favor.[54]

If the non-moving party fails to go beyond the pleadings to provide affidavits, answers to interrogatories, or admissions on file that present the existence of an element essential to his case, then summary judgment should be entered against him.[55]  A party that cross-moves for summary judgment must supply expert-based or fact-based refutation of his adversary's arguments in order to satisfy his burden.[56]  Otherwise, his motion should be denied.

**B.     Prisoners' First Amendment claims under § 1983**

The First Amendment states in pertinent part:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[57]  The Fourteenth

---

[52] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

[53] *Id.* at 255.

[54] *Id.* at 248.

[55] *Celotex Corp.*, 477 U.S. at 324.

[56] *Beard v. Banks*, 548 U.S. 521, 534 (2006).

[57] U.S. Const., Amend. 1.

Amendment incorporates the Establishment Clause and the Free Exercise Clause so as to be enforced under the color of state law.[58]  Civil Rights Act § 1983 makes legally liable any person who under the color of state law "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."[59]

Prisoners filing claims under § 1983 do retain their constitutional rights, but the exercise of those rights are limited by their incarceration and conflicting legitimate penological interests such as maintenance of prison security.[60]  Accordingly, prisoners retain First Amendment rights that are not inconsistent with their status as prisoners or legitimate penological interests,[61] and the Supreme Court has established a deferential rational basis standard for reviewing prison policy: If the policy reasonably relates to a legitimate penological interest, then it is constitutional.[62]

---

[58] *Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940).

[59] 42 U.S.C. § 1983.

[60] *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Pell v. Procunier*, 417 U.S. 817,  822-23 (1974); *Turner*, 482 U.S. at 89.

[61] *Pell*, 417 U.S. at 822.

[62] *Turner*, 482 U.S. at 89.

### 1.    *Turner standard*

Prisoners' § 1983 challenges under the First Amendment to prison policies should be analyzed in light of legitimate penological goals.[63]  This is a rational basis review.  The Supreme Court ruled in *Turner v. Safley* that the Eighth Circuit had improperly applied a strict scrutiny analysis to prisoners' First Amendment claims.[64]  Plaintiffs sued to enjoin the enforcement of Missouri penal regulation that limited correspondence between inmates at different institutions.[65]  The Court held that the policy was constitutional.  The announced policy aimed to avoid hampering prison officials and "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration."[66]

Four factors weigh in as to whether a prison policy is reasonable.  First, the penological interest must be legitimate and neutral.  The policy challenged under the First Amendment must have a valid connection that is not "so remote as to render the policy arbitrary or irrational."[67]  Second, reasonableness may hinge on whether there are alternative means for exercising the right.[68]  Third is a determination of what impact accommodating the

---

[63] *Pell*, 417 U.S. at 822.

[64] *Turner*, 482 U.S. at 89.

[65] *Id.* at 82.

[66] *Id.* at 89, *citing Procunier v. Martinez*, 416 U.S.396, 407 (1974).

[67] *Id.* at 89-90.

[68] *Id.* at 90.

-14-

right will have on other inmates and guards and on the allocation of prison resources.[69] Fourth is whether there are ready alternatives for the prison officials at *de minimus* cost.[70]

The *Turner* precedent has afforded prison officials increased deference in First Amendment claims.  In *O'Lone v. Estate of Shabazz*,[71] inmates of a New Jersey prison were prohibited from returning to the main building during the day if they were on work detail. The defendants claimed that the policy was put in place to relieve the burden of security checks at the main gate.  The Islamic plaintiffs sued alleging that the policy unconstitutionally violated their First Amendment rights of free exercise because they could no longer attend Jumu'ah, a weekly Muslim congregational service.[72]  The court applied the *Turner* rational basis standard and found the policy to be reasonable: "Though the availability of accommodations is relevant to the reasonableness inquiry, we have rejected the notion that 'prison officials ... have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.'"[73] Such a heightened scrutiny would not afford prison officials the deference they are owed under *Turner*.[74]

---

[69] *Id.*

[70] *Id.*

[71] *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987).

[72] *Id.* at 345.

[73] *Id.* at 350, citing *Turner*, 482 U.S. at 90-91.

[74] *Id.*

The Sixth Circuit has long balanced prisoners' First Amendment rights and the objectives of the penal system.  In *Meadows v. Hopkins*,[75] the plaintiffs challenged a Tennessee prison policy that allowed security officials to read incoming mail.  They filed suit under the First Amendment claiming that the security goals could be accomplished by less restrictive means.  But the court affirmed a district court ruling that afforded prison officials deference in matters that could affect prison security:  "When an institution infringes upon a specific guarantee such as the First Amendment, the regulation must be evaluated in light of the central objectives of prison administrators ... Our comprehensive system of justice requires some neutral accommodation between institutional objectives and the provisions of the Constitution that are of general application."[76]  Because the policy struck a reasonable balance between the exercise of the prisoners' rights and the furtherance of prison security, the policy was valid.

Recently, the Sixth Circuit reversed summary judgment for a prison restricting First Amendment rights where an alternative was available at a *de minimus* cost.  In *Flagner v. Wilkinson*,[77] an Orthodox Hasidic Jewish prisoner filed a First Amendment claim because after five years of officials acquiescing his facial hair growth in violation of prison policy, they suddenly forced him to shave.[78]  After a *Turner* analysis, the Sixth Circuit concluded

---

[75] *Meadows v. Hopkins*, 713 F.2d 206 (6th Cir. 1983).

[76] *Id.* at 210.

[77] *Flagner v. Wilkinson*, 241 F.3d 475 (6th Cir. 2001).

[78] *Wilkinson*, 241 F.3d at 478.

-16-

that the security interests were too generalized to be applied to the plaintiff, that the policy as applied was unreasonable because officials acquiesced the plaintiff's facial growth for five years, and that it was not burdensome for guards to routinely inspect this individual's facial hair for hidden contraband.[79]  Because the prison did not need to incur additional cost in allowing the plaintiff's exercise, the enforcement of the policy in this particular case was an "exaggerated response."[80]

On the other hand, prison administrators won summary judgment in a recent Western District of Michigan case that involved a Kosher meal policy similar to the one here.  In *McGraw v. Riley*,[81] the prison used a written test to determine the plaintiff's sincerity of belief before he qualified for the Kosher program.  The plaintiff failed the test, and so he brought a First Amendment claim against the prison.  The district court concluded that the prison's restriction on Kosher meals was appropriate and the test a reasonable means to enforce the restriction.[82]

## C.    Application

In this case, the materials provided by the defendants certainly establish that they have a legitimate penological interest furthered by former ODRC Policy 72-REG-07 § V(E).  In his declaration, ODRC Assistant Chief Counsel states explicitly that the central objective for

---

[79] *Id.* at 485-87.

[80] *Id.*

[81] *McGraw v. Riley*, No. 2:06-cv-200, 2007 WL 2479471 (W.D. Mich. Aug. 28, 2007).

[82] *Id.*, at *4.

-17-

the policy is cost control for budget constraints: "Providing Kosher meals to every inmate who requests such a meal is not cost effective.  ODRC must adhere to budget constraints and therefore limits Kosher meals to only those inmates whose religion mandates such."[83] Yaacov does not refute that cost control qualifies as a legitimate penological interest.

Under the first *Turner* prong, this policy rationally relates to the legitimate budget interest by eliminating costs.  The defendants assert that to properly prepare Kosher meals within prisons would require expensive kitchens, and purchasing pre-packaged Kosher meals is cost prohibitive, at a price of $7.00 per meal as compared to $0.80 per main-line meal.[84] And the Orthodox qualification under the challenged policy resembles the sincerity of belief test used in *McGraw*, where defendants were granted summary judgment based on their policy's reasonableness.

Under the second *Turner* prong, the  policy here does not exclude all available means for free exercise.  Yaacov states that while the policy was enforced and administrators denied him Kosher meals, he had the alternative of eating cereal, peanut butter, and fresh fruits and vegetables.[85]  Stout's declaration adds further that prisoners have the option of purchasing Kosher meals from the commissary.[86]  Unlike the policy in *O'Lone*, which made the practice

---

[83] ECF # 27, Ex. 2 at 2.

[84] *Id.* at 12.

[85] ECF # 1 at 7.

[86] ECF # 27, Ex. 3 at 2.

of Jumu'ah completely impossible and still was upheld as constitutional, the policy here does

not eliminate free exercise, but merely limits it.

Under the third and fourth prongs, the *Turner* analysis again weighs in favor of the

policy's reasonableness.  The record does not indicate what impact accommodating Yaacov's

free exercise under the old policy had on other prisoners and guards.  But the record makes

clear that accommodating Kosher meals affects prison budgetary resources.  Participation in

the Kosher program costs $5,110 per year, as it does for every participant, and Yaacov puts

forth no alternative to the expense of the program at *de minimus* cost.[87]  Prison officials in

*Wilkinson* needed not incur additional cost by inspecting the plaintiff's beard.  Here, on the

other hand, additional expense is unavoidable.  In the language of the Sixth Circuit in

*Meadows*, this policy "strikes a reasonable balance" between the penological interest at stake

and prisoners' free exercise.[88]

Yaacov files his response a cross-motion for summary judgment "without any

supporting affidavits" by his own declaration.[89]  He responds to the defendants' justification

under the rule of *Turner* not with expert-based or fact-based refutation as required at the

summary judgment stage, but rather, with a cross-motion for summary judgment based on

conjecture:

---

[87] ECF # 27, Ex. 2 at 2.

[88] *Meadows*, 713 F.2d at 210.

[89] ECF # 37, Ex. 2 at 4.

> Plaintiff moves the Court to answer the following questions: "What has changed between Plaintiff's request for Kosher meals, and the filing of the instant Complaint?" "Why are the Defendants now providing the meals?" "Why is the policy now being revised if, in its current form, it serves penological interests?" "Why not wait until the Court decide [sic] the issues?"[90]

The prison's willing here to do more than that required by *Turner* is irrelevant.  A prison is free to adjust its policies to exceed the minimal standards approved by the *Turner* court.  The issue is whether the challenged policy satisfied the *Turner* standard.

Yaacov supplements his motion with Speed's declaration that Yaacov lost weight during the three years that the prison denied him participation in the Kosher program.  This is irrelevant to the *Turner* analysis.  If Yaacov suffered no violation of his limited free exercise rights, he is entitled to no damages.

I need not, therefore, consider the defendants' final three arguments that Yaacov cannot recover compensation under the PLRA, that he cannot make a case for punitive damages, and that qualified immunity protects the defendants.  As a matter of law, the defendants did not violate Yaacov's free exercise rights under the First Amendment by enforcing their former Kosher meal policy.  I find that the policy was constitutional, and the defendants are entitled to summary judgment.

---

[90] ECF # 37 at 15.

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment is granted, and Yaacov's cross-motion is denied.

IT IS SO ORDERED.


Dated:   July 31, 2009                              s/ William H. Baughman, Jr.
                                                    United States Magistrate Judge